Vo v. Leo, No. 845-03 Cnsc (Katz, J., Oct. 22, 2003)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                    SUPERIOR COURT
Chittenden County, ss.:                         Docket No. 845-03 CnSC


NGUYEN K. VO

v.

ROBERT LEO


FINDINGS OF FACT
CONCLUSIONS OF LAW
NOTICE OF DECISION


This matter came before the court for trial on plaintiff's claim that the automobile he purchased from defendant had a serious defect, known to defendant, which resulted in an engine fire effectively destroying the car. On the basis of the evidence presented, the following decision is announced:

FINDINGS OF FACT

1.      Plaintiff purchased a 1996 Mitsubishi Eclipse from defendant for $6,000.

2.      Within 24 days, after approximately 2,000 miles of use, the engine compartment caught fire, apparently from the alternator, effectively destroying the vehicle.

3.      Defendant buys used cars, fixes them up one at a time, and then sells them.  That is apparently how he makes his living.

4.      Defendant acquired this Mitsubishi from Eli Auto Sales, Lawrence, Massachusetts.  The bill of sale accompanying that transaction noted:

sold as is

engine not running

parts only.

5.      Seller Leo then proceeded to fix up the car, to the point that it looked very shiny and attractive.  He then parked it outside the Winooski School, where it would be noticed, with a "For Sale" sign including his telephone number.  Purchaser saw the car, called seller, and they met to discuss it.  When they met, seller pointed out to purchaser that one tire was quite deflated, and that therefore, although he could take the car out for a test drive, he would have to keep it under 50 miles per hour.  Purchaser took the car out for a drive, liked it, and proceeded to purchase it.

6.     Purchaser is a Vietnamese immigrant.  He speaks only a few words of English.  Seller had purchaser "sign" the bill of sale he had received from Eli Auto Sales, although this purchaser did not buy the car from Eli.  In fact, purchaser put his name on the line labeled "Print Name" immediately below the intended "Signature" line where seller had signed when he first acquired the auto.  It is not clear to the court whether purchaser printed his name because the line says "Print Name," or because that is the only way he can write in English.  There was no proof on the point, and we do not take it for granted that purchaser can read English.

7.     The car shook when backed up, even before the engine compartment fire.

8.     The engine wiring harness on this Mitsubishi was not the original one.  That original was not on the car when seller acquired it from Eli.  Seller had been told that the proper harness was over $2,000, and must be obtained from Mitsubishi.  This is a sports car, and if the correct harness is not used, it will not run properly.  The alternator fire is probably related to the incorrect harness problem.

9.     Although the letter from Arthur Seoane is hearsay, it is quite factual and quite specific.  To the extent it quotes Fred from Fred's Place, in Richmond, that person is making statements somewhat contrary to his pecuniary interest, in that he is severely criticizing the business ethics of a person with whom he regularly does business–the seller in this case.  We therefore are of the view that the Seoane letter should be given considerable weight.

10.     We reach the decision to accord Seoane's letter such weight because of the very suspicious circumstance at the time of the sale. This auto had just been fixed up be the seller. He is in the business of doing just this. It was all shined up to attract customers, and was parked in Winooski. Yet one tire was low on air. For a person obviously familiar with cars to leave a tire low, just when he is trying to make a good impression, and to also know that it is low, at a location where several service stations with air pumps were within a five (probably two) minute drive, is highly suspicious. But we know that the seller here, Mr. Leo, used the fact of that under-inflation to tell his purchaser not to drive the car above 50 miles per hour. Hence, the clear inference from the facts is that seller Leo deliberately deflated the tire, so as to have an excuse to keep the test drive speed down. Under these circumstances, the Seoane letter receives substantial corroboration.

11.     This car was destroyed by an engine fire clearly electrical in origin, probably related to the wiring harness.

12.     The incorrect wiring harness was known to be incorrect by the seller, Leo, (Seoane letter) who deliberately masked the problem with the deflated tire.

13.     Purchasers have been harmed in excess of $6,000 by the acts of defendant seller Leo.

CONCLUSIONS OF LAW

14.     Fraud is defined as an intentional misrepresentation of existing fact affecting the essence of the transaction. Silva v. Stevens, 156 Vt. 94,

102 (1991) (citing Union Bank v. Jones, 138 Vt. 115, 121 (1980). The specific elements are "(1) concealment of facts, (2) affecting the essence of the transaction, (3) not open to the defrauded party's knowledge, (4) by one with knowledge and a duty to disclose, (5) with the intent to mislead, and (6) detrimental reliance by the defrauded party." Fuller v. Banknorth Mortg. Co., 173 Vt. 488, 490 (2001) (mem.).

15.     By purposely deflating the tire at the time of inspection, seller concealed the fact that there were serious mechanical/electrical problems with the car. Buyer did not know and had no way of knowing that the car was improperly repaired or that it had originally been sold to the seller in such poor condition. Seller had a duty to disclose that the car was not running properly. This is particularly important because the fatal flaw in the car was electrical, nascent, asymptomatic, and not apparent to buyer. Buyer relied on seller to sell him a working and safe automobile. Instead, seller masked what was a clear defect in the car with the intent of passing the car off as functional and safe.

16.     Seller asserts that he is protected by the "Bill of Sale" which contains the magic words "sold as is." Such words, however, do not automatically discharge seller from his obligations to buyer. Silva, 156 Vt. at 112–13. "The law does not favor such disclaimers, very likely because they so often play a part in fraudulent or unconscionable transactions." Lectro Management v. Freeman, Everett, & Co., 135 Vt. 213, 216 (1977). The function of a disclaimer is limited by both tort and commercial law. Tort law is loathe to recognize disclaimer and arguably does not allow it. Restatement (Second) of Torts § 402A cmt. m (1965) (disallowing warranty disclaimers as a defense to fraudulent misrepresentation). While more accepting, the Uniform Commercial

Code requires that the disclaimers be clear and fully understood as the seller exclusion of implied warranty. 9A V.S.A. § 2-316(3)(a) cmt. 6.

17. In this case, the seller's disclaimer is not his. It is part of the warranty disclaimer that he received when he purchased the car. As disclaimer language, the proximity of "sold as is" requires it to be read with the phrases "engine not running" and "parts only." Since seller was not selling the car as parts and the engine ran at time of sale, it is difficult to understand how a fluent English speaking buyer would understand the disclaimer to apply, let alone a buyer of limited English capacity. The disclaimer is simply not clear enough, and there is no evidence that seller made it clear that he was disclaiming his implied warranties. Under either a tort or commercial law theory, the disclaimer is ineffective. Moreover, it is misleading and deceptive. Seller is forewarned that the law does not recognize "magic words" when seller's behavior belies their intent.

18. Because of jurisdiction limit of Small Claims Court, the maximum damages to be awarded are $3,500 plus $140 in interest accruing from the time the claim was asserted.

Dated at Burlington, Vermont, _____, 2003.


_____
Judge